UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------x
UNITED STATES OF AMERICA,

                                                                MEMORANDUM OF
                                                                DECISION AND ORDER

- against -

                                                                01-CR-650 (ADS)

WILLIAM H. ROBINSON,

                Defendant.
---------------------------------------------------------------x

A P P E A R A N C E S :

       BENTON J. CAMPBELL, UNITED STATES ATTORNEY
       EASTERN DISTRICT OF NEW YORK
       610 Federal Plaza
       Central Islip, New York 11722
             By:    Alan Bode, Assistant United States Attorney

       ROBERT LARUSSO, ESQ.
       Attorney for the Defendant-Releasee
       300 Old Country Road, Suite 341
       Mineola, New York 11501

       UNITED STATES PROBATION DEPARTMENT
       EASTERN DISTRICT OF NEW YORK
       202 Federal Plaza
       P.O. Box 9012
       Central Islip, New York 11722
             By:    Dennis Stickley, Sr. United States Probation Officer

SPATT, District Judge.

This is a decision following a Violation of Supervised Release Hearing. In this case, William H. Robinson ("Robinson" or the "Releasee"), the Releasee, was accused of four charges of Violation of Supervised Release. In the initial Violation of Supervised Release Report, dated January 7, 2010, there were two charges, as follows:

Charge No. 1: New Criminal Conduct: Attempted Assault in the First Degree

       On or about, December 31, 2009, the offender violated the following mandatory

condition of supervised release: *"The defendant shall not commit another federal, state or local crime."* To wit: on the above date, the offender committed a new state crime by attempting to assault another individual with a deadly weapon, in violation of New York State Penal Law.

**Charge No. 2: Association with an Individual Engaged in Criminal Activity**

On or about, December 31, 2009, the offender violated the following standard condition of supervised release: *"The defendant shall not associate with any persons engaged in criminal activity and shall not associate with any person convicted of a felony, unless granted permission to do so by the probation officer."* To wit: on December 31, 2009, the offender did associate with Shallicke McRae, who was engaged in criminal activity.

On January 20, 2010, Probation Officer Stickley filed a "Supplemental Violation," in which two additional charges were initiated, as follows:

**Charge No. 3: New Criminal Conduct: 18 U.S.C. § 1001, False Statements**

On January 8, 2010, the offender violated the following mandatory condition of supervised release: *"The defendant shall not commit another federal, state or local crime."* To wit: he committed a new federal crime by making false statements to the Probation Department about knowing Shallicke Yuhara McRae.

**Charge No. 4: Association with a Known Felon**

During January 2010, the offender violated the following standard condition of supervised release: *"The defendant shall not associate with any persons engaged in criminal activity and shall not associate with any person convicted of a felony, unless granted permission to do so by the probation office."* To wit: the offender knowingly associated with Shallicke Yuhara McRae, a convicted felon.

A hearing was held in this matter on January 11, 2010, February 19, 2010 and March 5, 2010.

This memorandum opinion sets forth the Court's decision.

### I. The Standards

According to the provisions of 18 U.S.C. § 3583(e)(3), the burden of proof in a Violation of Supervised Release Hearing is "by a preponderance of the evidence." In such a hearing, the Releasee is entitled to written notice of the violation; disclosure of the evidence against him; an opportunity to appear, present evidence and question any adverse witness; an opportunity to make a statement and present any information in mitigation. See Federal Rules of Criminal Procedure 32(b)(2).

It is well settled that "the full panoply of rights" due to a defendant in a criminal prosecution does not apply to violations of supervised release hearings. See United States v. Pelensky, 129 F.3d 63, 68 (2d Cir. 1997). "Because revocation proceedings generally have not been considered criminal prosecutions, they have not been subject to the procedural safeguards, including the rights to trial by jury and to accusations proved beyond a reasonable doubt, associated with a criminal trial." United States v. Carlton, 442 F.3d 802, 807 (2d Cir. 2006). See Pelensky, 129 F.3d at 68; United States v. Lettieri, 910 F.2d 1067, 1068 (2d Cir. 1990); see also United States v. Knights, 534 U.S. 112, 120, 122 S.Ct. 587,592, 151 L.Ed.2d 497, (2001); 18 U.S.C. § 3583.

Indeed, the Supreme Court has instructed that "the process should be flexible enough to consider evidence including letters, affidavits and other material that would not be admissible in an adversary criminal trial." Morrisey v. Brewer, 408 U.S. 471, 489, 92 S.Ct. 2593, 2604, 33 L.Ed.2d 484 (1972). See also Gagnon v. Scarpelli, 411 U.S. 778, 782, N.5, 93

S.Ct. 1756, 1760 N.5, 36 L.Ed2d 656 (1973) (The Court does not "intend to prohibit use where appropriate of the conventional substitutes for live testimony including affidavits, depositions and documentary evidence."). Also, reliable hearsay evidence may be admitted as a substitute for live testimony. United States v. Pratt, 52 F.3d. 671, 676, 677 (7th Cir. 1995).

## II. The Hearing

### A. The Government's Case

Odessa Goins has worked for a health care union for 20 years. She recently married Darryl Goins, who was released from prison approximately one year ago. She related two incidents involving the Releasee. On Christmas Eve 2009, she and Darryl went shopping at the Green Acres Shopping Center. As they were leaving the mall, she saw two men outside the mall. She heard one man say "they have something for him" and one man reached his hand under his coat. One man was a dark skinned heavy set man. The other was medium height and light-skinned. Mrs. Goins then identified the Releasee as one of the men but not the one who made the gesture. Then she and her husband left the area.

The second incident occurred on New Year's Eve 2009. At about 6 p.m., Odessa and her husband were going to the movies and she decided that first she would wash clothes at a laundromat on Jerusalem Avenue. They walked over to a Carribean food store, "to get something to eat". Outside of that store she noticed the same two "guys" that she saw at the Green Acres Mall. The witness identified the Releasee in Court as one of the two men. Odessa saw the Releasee make the same gesture, as was done earlier at the Green Acres Mall, namely he was about to pull something out of his coat, "They said what they were going to do to him." (Tr. 10). Then they turned to walk away and Odessa heard two shots.

4

She didn't see who fired but she knows that it was the Releasee "because he's the one that did the gesture." (Tr. 10). When the shots were fired she was facing away from them. At that point, her husband pushed her out of the way and "they left the area in a hurry". (Tr. 12).

After she heard the shots she noticed one vehicle, a silver Charger, with black tinted windows with lights like diamonds in a row.

On January 7, 2010, Odessa was driving home from work with her husband, when he received a cell phone call. She overheard a man's voice and a girl's voice who said "I give up. You win." (Tr. 13). She did not recognize either voice.

On cross-examination, Odessa testified that she does not know William Robinson and she never saw him before December 24, 2009. However, her husband Darryl told her about him, calling him Billy. He told her there was an old grudge between the two, in the past, and that there was bad blood between them. She assumes that the dispute between them was over drugs. Her husband was involved in drugs and fighting and was released from jail in June 2009. Her husband reported the Jerusalem Avenue incident to his Parole Officer. She did not report the incident to the police. Her husband reported it to the police about five days later. Odessa testified that she does not know whether the man she observed on December 24th moved his right hand or his left hand, but she heard him say, "I have something for you."

With regard to the New Year's Eve incident, Odessa testified again that the Releasee said "I'm going to get you - I have something for you."

Q. What did he say?

A. And then I heard another shot.

5

Q. What did you hear him say?

A. I'm going to get you. I have something for you. I'm going to get you.

Tr. at 35.

She heard two shots but does not know who fired them. Odessa stated that the two men were about 40 feet away but were close enough for her to see their faces and bodies. She heard no windows shattering or bullet hitting a car.

Odessa Goins was recalled in the Releasee's case and was shown photographs of the Jerusalem Avenue area. Although she was not entirely precise in describing where the incident occurred and her testimony was somewhat vague in that regard, she again stated that she was on the side by the laundromat and was walking to the Carribean restaurant. Odessa was by the Carribean restaurant when she heard the first shot. She froze and turned around. Her husband pushed her back. She looked across the street and recognized the same two men she saw in the prior Christmas Eve incident. She began running away from the men and toward her car. Odessa recognized the Releasee's face in the photograph shown to her.

Odessa Goins was not a totally persuasive witness, but the Court finds her to be believable.

The Court would characterize Darryl Goins as a strange and difficult witness, who declined to answer questions responsively on many occasions. To begin with, on the first day he testified, January 11, 2010, he had just been released from the hospital that morning. He stated that he was suffering from chronrchitis, asthma and the flu. In addition he takes medication for depression and sees a therapist. Darryl had an extensive criminal history including eight felony convictions and was released from his latest incarceration in January

6

2009 after his most recent 6-year term. He used and dealt with drugs and had a weapons conviction. He is currently in drug therapy and tested positive as recently as November 3, 2009.

Darryl recognized and identified the Releasee in Court. He knows the Releasee by the name of Billy Latson from his days as a drug dealer and knows his mother. Darryl testified that he had a dispute with the Releasee's partner Shallicke McRae. He stated that there was jealousy and hatred among drug dealers including the persons involved in this case. It seems that Darryl and McRae were competitors in the drug dealing field.

With regard to the Christmas Eve incident at the Green Acres Mall, he saw McRae and Robinson, and they exchanged stares. McRae went to reach for a gun and Robinson, who he identified in Court, said "No, the police is right there." They immediately left. On Monday, December 28, 2009, he reported this incident to Gerald Finklestein, a Counselor at his drug treatment program. He also reported the incident to the partner of his Probation Officer and later, also to the Hempstead Police Precinct, and was told to report it to his Probation Officer. He said he didn't go to the police originally because "he doesn't go to the cops for nothing." He lives by the street code.

As to the New Year's Eve incident, Darryl related that his wife wanted to get her hair done, at the Magdalena Beauty Parlor, stop at the laundromat and eat at the Carribean restaurant. They never had a chance to go to any of these places. He heard a bang, loud and clear. It sounded like a shot. He turned around. His wife said "Ain't that the guy that was at the Green Acres Mall." She was referring to McRae. He saw McRae reaching for his gun and he pushed his wife aside. He then heard another shot. He saw Robinson, and it appeared that he had something in his hand. Darryl testified that Robinson had fired the

7

shot because McRae was still reaching for his gun. However, he never saw Robinson with a gun in his hand. After the two shots were fired, he and his wife ran into their car and drove away. He saw a silver Honda and silver Charger make a u-turn and drive away.

Darryl reported the incident to his Probation Officer on the following Monday, but was afraid to do anything else. Darryl stated that he had changed his life around; had a good wife and "didn't want that life anymore." So that while he was tempted to get a gun and look for them, he didn't want this life anymore and so he turned to the police and his Probation Officer. Darryl saw his Probation Officer on Tuesday, January 5th and he was directed to report to the police. He reported to the police who took a statement from him, that Darryl frankly stated omitted several things about Billy Latson.

On Thursday, January 7, 2010, Darryl received two cell phone calls. The first call was from Billy Latson.

> Q. Now, I'm going to draw your attention to approximately last Thursday, which was January 7.
>
>    Did you receive any cell phone calls on that late afternoon of January 7 which relate to this incident or these incidents?
>
> A. Yes, I did. I received two phone calls.
>
> Q. Who was the first call from?
>
> A. Mr. Billy Latson here, who is in the courtroom at this time.
>
> Q. And you recognized the voice to be his?
>
> A. Yes.
>
> Q. And what did he tell you? What did he say?
>
> A. Okay. He says - - let me make sure I'm correct.

He said - - he asked me, can we meet? He asked me, can we meet somewhere? He said he don't want no problems. You know, it's over with. You know, what I'm saying? I don't want no problems.

And I said oh, really? I said what you did was wrong. What you all did, you could have killed me. Something could have happened to my wife. You could have killed her. He said you can pick the place you can meet me.

And he said as a matter of fact you know what? He said, I'm going to have Little Me call you. I said who's that? Are you talking about your sister? He said yes.

Q. So Little Me?

A. Little Me means his sister.

Q. Okay.

A. So she called me and says well, what this phone call is about - -

\* \* \* \* \*

Q. What did she say, his sister?

A. The sister said, she said what this phone call is basically saying is that you win. You win. That's what she said.

Q. And what if anything did she want you to do?

A. She said, she asked me was I going to court.

Q. And what did you say?

9

> A. I told her no.

Tr. at 93-95.

On cross-examination, Darryl exhibited further confusion and unclear testimony as to the location of the New Year's Eve incident. He testified that he had been in a drug war with McRae and there was deep-seated hatred between them. Under intense questioning by the Releasee's attorney, Darryl seemed confused as to the Jerusalem Avenue location of the New Year's Eve incident, even though he had been there before. Further, Darryl complained that he is very sick, and can't recollect a lot of things. Also, he stated that the New Year's Eve incident happened so fast, "I just wanted to get out of there." In addition, his written statement to the police committed some obvious errors, such as the men being 70 yards away.

Senior Probation Officer Dennis Stickley testified that he has been supervising William Robinson since April 8, 2008. In January 2010, Stickley received a call from a New York State Parole Officer with regard to a shooting involving the Releasee and McRae. He was told McRae was the shooter and Darryl Goins was the victim. On January 6, 2010, he interviewed Goins with his Parole Officer and Frederick Burns, the Parole Officer for McRae. At that interview, Darryl explained the circumstances of the December 24th and December 31st events.

Thereafter, Stickley interviewed McRae at the First District Court in Hempstead. McRae told him that he knew Robinson from the neighborhood and knew his name. However, McRae also told Stickley that he had recently been laid off from his job at BJ's Wholesale in Farmingdale. He worked at BJ's Wholesale for about 2 ½ years. That fact was significant to Stickley because Robinson also worked at the same company during that

same period of time.

During an interview with Stickley the Releasee denied knowing anything about the incidents involved. He told Stickley that it must be somebody else, "it couldn't have been me." (Tr. at 252). In addition, Robinson told Stickley that he did not know McRae; that he never associated with him; never worked with him; and never took part in a shooting with McRae.

By a subpoena, Stickley obtained the records of the Nassau County Jail with regard to inmate Shallicke McRae, including a CD-ROM containing telephone recordings (Govt. Ex. 2). A review of these telephone calls reveals that the Releasee did have contacts with McRae.

> Q. During your investigation, did you review the calls on the CD to determine whether the defendant had had any contact with Shallicke McRae?
> 
> A. Yes.
> 
> Q. And what did you find?
> 
> A. I found several telephone calls that did indicate there was contact between Mr. Robinson and Mr. McRae.
> 
> Q. And do you recall the specific nature of each of the conversations?
> 
> A. Yes.
> 
> There were three in particular, the first one being a call that was initiated from Mr. McRae to his wife or I don't know if she's wife or girlfriend, but his significant other, in which he with requested the telephone number for an individual referred to as Scrap, S-C-R-A-P, to which McRae's significant other

11

provided Mr. McRae with Mr. Robinson's cell phone which is identical to the cell

phone that is reported to the probation department.

Do you want me to continue?

Q. If you can tell us about the other calls as well.

A. The other two calls that were noted were actual calls that were initiated by Shallicke McRae from Nassau County Jail to his significant other during which Mr. Robinson is clearly heard speaking with Mr. McRae at length regarding the case that was pending for both of them, and regarding various details of the case.

Q. And you can identify the defendant's voice based upon your dealings with him as one of your probationers?

A. Yes.

Q. During the phone calls that you - - where you heard the defendant and Shallicke McRae talking, at any point did any of the parties identify themselves to the other caller?

A. They identified each other as again using the nickname scrap, S-C-R-A-P, and the nickname Home, H-O-M-I-E.

Q. At any point on any of those calls did anybody indicate they did not know who was on the other end of the phone call?

A. No.

Tr. at 256, 257.

On cross-examination, Stickley conceded that when he interviewed Robinson after

12

these occurrences, and after he was arrested for Violation of Supervised Release, he never gave him his Miranda warnings. Stickley said, "I don't believe I was required to." (Tr. at 267).

Also, Stickley testified that McRae was charged by the Nassau County authorities and Robinson was never charged with these alleged shootings.

Also offered in evidence are the tapes of three telephone calls. The fourth call made on January 10, 2010, log #1A0820AF, was initiated from the Nassau County Jail to telephone number 510-807-8437. In that call, McRae is heard talking to his wife, who asks if McRae wants the telephone number for "Scrap". She provides McRae with telephone number 646-251-0018. According to the probation officer, this telephone number is the same number that Robinson reports to the Probation Department as his cell phone number. McRae responded that he will call him when we get off the phone.

The second telephone call made on January 10, 2010, log #1A0820A0, is a prepaid call from an inmate at the Nassau County Jail. Robinson was on the phone. There was a conversation between McRae and Scrap. The third and last call was made on January 12, 2010. Heard on the call was "Did they charge Scrap with anything?" and "Let me speak to Scrap", and "I'll get you back tomorrow." In addition, laughter could be heard between the two men.

B. The Releasee's Case

The Releasee recalled Odessa Goins. She was again shown photographs of the December 31, 2009, Jerusalem Ave. location. Again her description of the location is vague and uncertain. However, she again testified that she was by the Carribean restaurant when she heard the first shot. She froze and looked across the street and recognized the same two

13

**men she saw in the prior Christmas Eve incident. After she heard the second shot she froze again; her husband pushed her backward and she began running away from the men and toward her car. Her husband ran after her and the two got into the car and left. Odessa again recognized Robinson's face among the six men in the photograph in evidence.**

## III. FINDINGS

### A. Charge No. 1 - New Criminal Conduct: Attempted Assault

The Court finds that the Government has established, by a preponderance of the evidence, that on December 31, 2009, the Releasee William H. Robinson committed a new state crime by attempting to assault Odessa Goins and Darryl Goins with a deadly weapon, namely a firearm, by shooting at them, in violation of the New York State Penal Law.

Although not the most persuasive witnesses, the Court does credit the testimony of Odessa Goins and Darryl Goins as to the shooting on Jerusalem Avenue on December 31, 2009.

### B. Charge No. 2 - Association With An Individual Engaged In Criminal Activity

The Court finds that the Government has established, by a preponderance of the evidence, that on December 31, 2009, the Releasee William H. Robinson did associate with Shallicke McRae, who was engaged in criminal activity.

In this regard, the Court finds that the evidence is clear that William Robinson and Shallicke McRae knew each other. First, they worked together for the same company for two to three years. Second, the phone calls in evidence clearly indicate that they knew each other. McRae referred to Robinson as "Scrap", obviously a nickname. In addition, the tone of the phone calls indicated that they knew each other and, perhaps, associated together for this period of time. Accordingly, this Court finds that Robinson did knowingly associate with McRae, while both were engaged in criminal activity.

### C. Charge No. 3 - False Statements

Here, there is no doubt that the Government clearly proved that Robinson made false statements to Senior Probation Officer Dennis Stickley about not knowing Shallicke McRae.

15

However, when he reported to Stickley, Robinson was already under arrest for Violation of Supervised Release and it is conceded that he was not given his Miranda Rights. The interesting question therefore, is: Does a person under supervised release, and having certain obligations to report to his probation officer and being under arrest for Violation of Supervised Release, have to be afforded his Miranda Rights when he is reporting, as he is obligated to do?

The Government claims, in Charge 3, that Robinson made a false statement to Officer Stickley when he denied knowing McRae. Robinson requests that the Court dismiss Charge 3. In particular, Robinson contends that his Fifth Amendment rights were violated because the discussion with Officer Stickley in which he claimed not to have known McRae took place without administration of the warnings prescribed in Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602, L. Ed. 2d 694 (1966).

"Although Miranda's requirement of specific warnings creates a limited exception to the rule that the privilege [against self-incrimination] must be claimed, the exception does not apply outside the context of the inherently coercive custodial interrogations for which it was designed." Roberts v. United States, 445 U.S. 552, 560, 100 S. Ct. 1358, 1364, 63 L. Ed. 2d 622 (1980). Here, the Court's task is to determine whether this type of discussion with a probation officer is a custodial interrogation for which Miranda warnings are required. Although the case dealt with a routine presentence interview, the Second Circuit's decision in United States v. Cortes, 922 F.2d 123 (2d Cir. 1990), is instructive.

Before boarding a flight to Colombia at John F. Kennedy International Airport, Cortes was stopped by a customs inspector who gave him a customs form to complete. The form provided that all passengers carrying more than $10,000 in currency were required to

file a report before their departure. Cortes signed the form, declaring that he was carrying only $3,500.

However, an examination by customs agents revealed $3,646 on Cortes's person and more than $876,000 in money orders that were concealed within a radio packed inside his luggage. When Cortes was arrested, he expressed surprise about the money orders and claimed that he bought the radio from a stranger eight days earlier. Cortes eventually pleaded guilty to failing to file a currency report for the $876,000. While in custody, he was interviewed by a probation officer in connection with the preparation of a presentence report. Id.

During the interview, Cortes revealed to the probation officer that he had actually obtained the radio from a man named Leonardo. He stated that Leonardo offered Cortes $1,200 and round-trip airfare to Colombia to transport the radio. Cortes admitted that he knew about the money orders and also knew that he was probably transporting drug money. As a result of Cortes's admission, the presentence report recommended that his base offense level be increased because of his knowledge that the money orders were derived from criminal activity. Id. at 124-25.

After Cortes's lawyer objected to the enhancement, the Court held a hearing at which Cortes and the probation officer testified. The Court ultimately determined that the Government had established that Cortes knew the funds were derived from criminal activity. Cortes appealed claiming, among other things, that his Fifth Amendment rights were violated because the probation officer failed to Mirandize him prior to the presentence interview.

The Second Circuit began its analysis by noting that other circuits had found that a

defendant is not entitled to a Miranda warning at a post-conviction presentence interview. Id. at 126 (citing United States v. Miller, 910 F.2d 1321, 1326 (6th Cir. 1990), United States v. Rogers, 921 F.2d 975, 979 (10th Cir. 1990), United States v. Jackson, 886 F.2d 838, 841-42 n. 4 (7th Cir. 1989), Baumann v. United States, 692 F.2d 565, 575-77 (9th Cir. 1982)). The Court observed that this line of cases rested on the view that a routine presentence interview does not raise Fifth Amendment concerns because probation officers generally serve a neutral, information-gathering function for the sentencing judge. However, the Court qualified this view, explaining that "the mere fact that a probation officer conducts the interview as an agent of the court does not necessarily mean that Miranda warnings will not be required if the probation officer then subsequently testifies on the government's behalf." Id. (citations omitted). The Court found that the Fifth Amendment may require a probation officer to administer the Miranda warnings to a defendant in cases where the defendant is ordered to submit to an interrogation and is unaware that the Government would use the information obtained against him. Id. at 127 (citing Estelle v. Smith, 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed. 359 (1981), and United States v. Chitty, 760 F.2d 425 (2d Cir.), cert. denied, 474 U.S. 945, 106 S.Ct. 310, 88 L.Ed. 2d 287 (1985)).

In the context of Cortes's interview, the Court found it significant that he did "not claim that he was ordered to submit to a presentence interview or that he was unaware that his answers to the probation officer's questions might have an adverse effect upon his sentence." Id. Ultimately, the Court determined that "[i]n light of the knowledge available to a defendant concerning the content of the presentence interview and the consequences of his responses to a probation officer's questions" the Fifth Amendment does not require "a probation officer to give Miranda-type warnings prior to a routine presentence interview."

18

**Id**. In this Court's view, it follows from Cortes that Officer Stickley was not required to administer the Miranda warnings to Robinson.

Officer Stickley testified that Robinson was initially confused when he was taken into custody and twice requested that Officer Stickley visit him to explain the charges. Tr. at 251. Shortly thereafter, Officer Stickley visited Robinson in his holding cell in the United States Marshal's Office. According to Officer Stickley, when he arrived, Robinson acknowledged that the officer was there to discuss the charges with him. As Officer Stickley proceeded to explain the alleged violations of his supervised release, Robinson denied any involvement in the shooting. When Officer Stickley described the details of the shooting including the alleged accomplice, he asked Robinson whether he "ever hung out with" or "associated with" McRae. Id. at 253. Robinson answered that he did not know McRae.

The Court finds it significant that Robinson *requested* the meeting with Officer Stickley. One of the animating concerns in Miranda was that a custodial interrogation, by its nature, often exerts coercive pressures on a defendant. However, it is unlikely that a defendant would feel this coercive pressure where the discussion is initiated by the defendant himself. This is particularly true when the discussion is had with a probation officer, a neutral information gatherer for the Court, rather than a prosecutor or a police officer. Moreover, unlike the situations in Estelle, 451 U.S. at 467-68, and Chitty, 760 F.2d at 430-31, Robinson was almost certainly aware that his answers to Officer Stickley's questions might have an adverse impact on the Court's subsequent determination of whether he had violated the terms of his supervised release. Under the circumstances, the Court finds that the Fifth Amendment did not require Officer Stickley to give Robinson a Miranda warning.

D. Charge No. 4 - Association With A Known Felon

Here the Releasee concedes that he is guilty of knowingly associating with Shallicke McRae, a convicted felon.

## IV. CONCLUSIONS

The Court finds that the Government has established, by a preponderance of the evidence, that the Releasee, William H. Robinson, is guilty of a Violation of Supervised Release as to all four charges.

The Releasee will be sentenced on April 23, 2010.

**SO ORDERED**.

Dated: Central Islip, New York
April 12, 2010

                                           */s/ Arthur D. Spatt*
                                           ARTHUR D. SPATT
                                         United States District Judge